The Fourth Case Werfel v. The Palestine Liberation Organization By the way, on this last case, I know you all are dividing your time, and because there are different entities, Paul, if it's okay, we'll, for the first advocate who wanted eight minutes, we're going to just put the clock on for eight minutes. May it please the Court, Asher Perlin and Dan Kalischer on behalf of the plaintiffs. The plaintiffs are the victims and the survivors and family members of the victims of the terrorist attack at issue in this case. The decision below is fundamentally flawed for several reasons. There are at least four paths to reversal. I'd like to provide the Court with a quick roadmap. The first issue, which will be addressed by the government, is the constitutionality of the PSJVTA. We will address the remaining three issues. Those are, one, that the lower court erred by extending due process rights to these defendants, which are international foreign governments and political actors. Two, that the district court erred in refusing to exercise specific jurisdiction over these defendants, and three, that the class action mechanism of Rule 23.2 provides a sound basis for personal jurisdiction over these defendants. I would like to reserve two minutes for rebuttal, and if the Court has specific issues, questions for me on the PSJVTA, I would prefer to save them for the rebuttal because time is limited. The most conventional way to dispose of this case is to find that these defendants are subject to specific jurisdiction. As alleged in the complaint, the defendants have engaged in extensive in-forum activities, including PR, lobbying, running an office, and other messaging activities that worked in conjunction, hand-in-glove, with the terrorism of the defendants. The allegation is that the two are intertwined, inextricably intertwined, and neither would have been effective without the other. Let me ask you a question about that. Now, there is no allegation that the PA or PLO have used for propaganda purposes the attack on November 18, 2014, correct? The PLO has not, there is no allegation that says that they have, that they've used it for propaganda purposes. And I know you've argued that Ford should be narrowly construed, but how is there, apart from Ford, a relationship that you've adequately alleged between the PA, well, it wouldn't be the PA anyway, right, it would just be the PLO, their propaganda activity in the United States and the, you know, and the terrorist, and the support of the terrorist attack? Well, I mean, whether they used this particular attack for propaganda going forward isn't really the question on this specific jurisdiction issue, because that relates to their activity leading up to the attack. What were their activities in the forum such that they could expect to be held into court for carrying out this attack? And they did engage in extensive, both the PA and the PLO, engaged in extensive PR, publicity, lobbying activities in the United States. So that's the relevant, also just to clarify, the relevant time period for U.S. activities for these defendants for the specific jurisdiction question is leading up to the 2014 attack. The U.S. activities under the PSJBTA relate to activities that occurred after the trigger dates for those activities, which is in 2020. So our argument is that the activities leading up to this attack contributed to the terrorism and gave meaning, like one of the elements of the ATA is that the act of international terrorism appear to be intended to influence a government or governments. And so a terrorist attack without messaging may not satisfy that standard, but a terrorist attack that's carried out in conjunction with shows the very purpose of that attack. So we do think that Hood provides a basis. Hood effected a sea change in the jurisdiction of a specific jurisdiction. It said that this court recognized, sorry, Ford Motors was a sea change. Hood versus American Auto Care, this court's decision held we need not decide whether the district court's analysis would have been correct under the law established at the time of its judgment. What we can say is that after the judgment, the Supreme Court made clear that a causal connection is not required. So before, whether you were talking about related to or arising out of, before Ford Motor, the plaintiff had to establish a causal relationship. After Ford Motors, it need only be, the U.S., the informed activities need only be relevant to the claim of the plaintiffs. That was a significant change and all of the decisions cited by the defendants finding that there was no subject matter jurisdiction, no specific jurisdiction over these defendants were decided under the pre-Ford Motor standards. They all required causation and some of them required that the plaintiffs prove that their injuries, the informed activities caused these particular, caused their particular injuries. That, none of those was required after Ford Motor. My time is very limited. I want to move on. Our Rule 23.2 argument I think is very compelling. I think the district court and the defendants never addressed the overwhelming weight of authority that we cite. They skirt the issue and I think the brief speaks for itself. And that provides a very sound basis for jurisdiction. Finally, the Due Process Clause. I don't mean to interrupt you, but you do know that this includes the time you wanted to save for rebuttal. I'm not trying to stop you. I just wanted to make sure you knew that. I'll save the rest for rebuttal. I don't want to be penalized for me explaining that. Give them another 25 seconds. I just wanted to make sure you knew that. Okay. The Due Process Clause was never intended to cover defendants like these. International governments, whether sovereign or not, international political actors that purport to be the official representatives of a foreign people, and the briefs cover that very thoroughly. I'll save the rest for rebuttal. Okay. Thank you. Ms. Dixon, so I think you have seven minutes. Yes, Your Honor. Thank you. Good morning and may it please the Court. Courtney Dixon for the United States, which intervened to defend the PSJVTA's constitutionality. I'm hoping to reserve two minutes of my time for rebuttal. The district court erred in holding that the PSJVTA violates Fifth Amendment due process. The statute sets out in explicit terms what actions these unique foreign non-sovereign defendants, if taken after a specified date, will be considered consent by those entities to personal jurisdiction in U.S. courts for a particular class of claims. Civil claims under the Anti-Terrorism Act of 1992 brought to address injuries to U.S. citizens from international terrorism. In holding to the contrary, Your Honors, the district court ignored the limitations in the PSJVTA and also ignored the unique foreign affairs context in which it was enacted. And as we note in our brief, the Second Circuit, which also in a recent decision held the PSJVTA unconstitutional, made the same errors. I'll note the United States in that case and the private parties in that case have petitioned for cert in the Supreme Court from that court's decision. My understanding is that's going to be conferenced later this week on the 22nd, and obviously if we learn that the court grants cert or otherwise, we would promptly let the court know. I'm happy to address, you know, obviously any particular aspects of the district court's decision. I'll note, you know, the district court largely rested his conclusion that Congress cannot deem any conduct with no connection to the forum whatsoever to be consent to jurisdiction. That's not what Congress did in the PSJVTA. The Congress chose conduct that has a fair and reasonable connection to the forum, particularly again in light of this unique foreign affairs context in which this case is enacted, and we think that's an important part of the analysis that the district court overlooked. What is exactly, you say that the, is it the Seventh Circuit that they applied for cert? The Second Circuit, Your Honor, the full decision, yes. My fault, Harry. Exactly, are these issues exactly the same ones that are being presented then? The PSJVTA's constitutionality is squarely presented there. I think in different cases there are also private plaintiffs, and I'm not totally aware of all of the arguments from the private plaintiffs are overlapping, but what the Second Circuit held in the full decision is that the PSJVTA is unconstitutional under the Fifth Amendment, largely on the same grounds the district court invoked here. We petitioned for rehearing en banc in that case. Judge Menasche dissented from the denial of rehearing en banc, and we think persuasively explained, you know, echoing many of the arguments that we presented in our briefs here, why the panel's decision was incorrect. But is an answer from that, is that going to resolve completely the case that we have? If the Supreme Court grants cert, and on the questions presented, I think it would bear on, yes, the same question here, whether the PSJVTA is constitutional. Do you have an opinion on whether the Fifth Amendment involves the same standards for minimum contacts as the courts have developed under the Fourteenth Amendment? So two things. I mean, first, this court has held in the, I don't know exactly how to say it, the PA v. Belt South decision that, you know, the same fairness and reasonableness considerations that apply in the Fourteenth Amendment also apply in the Fifth Amendment context. But I think that that court decision recognizes, and it cites an Eleventh Circuit decision that recognizes also that there's no reason to think that the same analysis applies mechanically in both cases. And that makes sense. I mean, a large portion of the, you know, the Supreme Court's cases in the Fourteenth Amendment context emphasize that part of that doctrine is about federalism, the limited and mutually exclusive sovereignty of states reaching out to exercise jurisdictions over citizens of other states. And one of the questions is, is the exercise of jurisdiction reasonable in our federal system of government? You know, Congress sits in a different position with respect to, you know, foreign entities, particularly foreign entities such as the defendants here. It sits in a different, the United States sits in a different position in the international sphere. There's no reason to think that the analysis would be, you know, identical in both contexts. Your Honor. I mean, generally, we look at, when we're looking at constitutional language or statutes, we look at the language that's used, and we would be looking at identical language. And that's why this Court's decision in Belsau says that, you know, fairness and reasonableness are relevant in the Fifth Amendment, too. But that doesn't mean, you know, if you're thinking about what is fair and reasonable for Congress to enact with respect to these unique foreign defendants that have history with the United States, there are several statutes addressing the extent to which these entities can operate and conduct a range of activities in the United States that has long been premised on many of the same concerns that motivated enactment of this statute. And as I noted, I mean, yes, concepts of fairness are reasonable, they're very broad. Cashing that out, the Supreme Court, in its Fourteenth Amendment decisions, at least, have looked, again, at questions of the interests of the forum, the interests of the states that have limited sovereignty. There's no reason to think that that all cashes out the same in the context of the Fifth Amendment. Right. It seems like at least the Fifth Circuit has looked at the two clauses and interpreted them consistently. Are you referring to the Douglas decision in the Fifth Circuit, Your Honor? I think that's what, you know, there was a lot of separate writings in that case. We're not asking this Court, again, to chart out any new grounds from what it did in its Bell South decision, just simply to recognize that when you are looking at concepts of fairness and reasonableness, you know, that is the touchstone of the, at least in the Fourteenth Amendment, looking at the same questions in the Fifth Amendment. You look at the forum, the particular defendant, the circumstances of the case here, you know, Congress has made judgments in the international sphere with respect to defendants that do have a unique relationship and history with the United States government. The due process analysis, the Supreme Court emphasized in Mallory, it's a scrutiny kind of mechanical or formulaic test in favor of a flexible approach that does look to these broad concepts. So, applying those broad concepts, yes, you would consider all of the circumstances and that's why I think, again, there's no reason to think that you would get exactly the same outcome in both circumstances. I see that I've run over some of my time that I was hoping to reserve for rebuttal, but I'm happy to answer any other questions that the Court has. I apologize. You'll have to apologize. We're going to give you a minute. Thank you very much, Your Honors. Good morning, and may it please the Court. I'm Mitchell Berger on behalf of the appellees. My headline point is that the PSJVTA is an imposed jurisdiction statute that's masquerading as a consent jurisdiction statute, but it fails due process either way. So, the Supreme Court in the Bauxite case, which some people call the International Insurance Corporation of Ireland, that's going to use too much of my time, so I'll call it Bauxite, but Bauxite is reaffirmed by the Supreme Court recently in Mallory, provides the due process test for consent or deemed consent to jurisdiction, and that test applies here. What Bauxite requires, as reaffirmed in Mallory, is that the defendant must engage in conduct that supports a presumption that the defendant has submitted to the jurisdiction of the Court. Comma, whether voluntary or not. Whether voluntary or not, but of course, and I'm glad you raised that, Judge Bacharach, because one of the arguments the plaintiffs make, but the government doesn't make, is that knowing involuntary doesn't apply here. We know that can't be correct, because the Supreme Court subsequently, in the Wellness case, said it is critical in determining deemed consent to jurisdiction that the conduct and the consent be knowing and voluntary. So what Bauxite means, when it says voluntary or not, in my reading of the case, and mine's the least important one compared to the three of you, but what it means is courts are empowered to infer from voluntary conduct that a defendant has submitted to jurisdiction, but the test remains the same. And what Bauxite itself said is that conduct has to be material to the issue of jurisdiction. So what happens? So it has, in other words, we have to look and see whether or not the guy driving in state really was intending to use the highway with cognizance of the fact that by using the state highway, he or she is consenting to jurisdiction within that state. Well, I think Hess, and I think all of these are objective tests. You don't have to look into the head of the driver in Hess. What you have to know is, is their conduct, looking objectively at the whole set-up and what the Supreme Court said in Hess and what it has said, for example, in Mallory, is the same thing, which is, look, if I have a quid pro quo, if I give you something and I tell you that has jurisdictional strings attached, you drive on my roads, you consent to jurisdiction here, then the conduct, that quid pro quo conduct necessarily reflects the submission of jurisdiction. We don't have that here. And that's my fundamental point.  Because there is, as the argument for the Supreme Court revealed and as the Mallory decision revealed, what is required is the antecedent authority of the forum to bestow the benefits. Clearly, that existed in Hess, right? The state can give you a driver's license. The state can allow you to drive on the roads. That doesn't exist here. And that is the point the Second Circuit made in full. Well, in full, let's say, let me change the facts. Let's say the government says, PA, if you sign a document here, you are consenting to jurisdiction within the 50 states. Well, you know, the act of signing is equivalent to the act of, like in Mallory, for example, of registering to do business in Pennsylvania or driving on the highway in Hess. So what is it conceptually that differentiates the conduct here from the conduct in Hess and Mallory? Yeah, so respectfully, that is an incomplete formulation of Mallory, because what Mallory says is two things, a formality. I signed a paper with jurisdictional strings attached. I got something for signing that paper. And Mallory, he got nothing for signing that piece of paper. Pennsylvania had a different statute, unrelated to the statute that Justice Gorsuch was relying on, that outlined what corporations can do within Pennsylvania. Well, that is the point, I think, that was argued by Justice Barrett in her dissent, that because the quid pro quo is expressed in two separate statutes, that that wasn't germane, but that view didn't prevail. What prevailed was the view, well, it's a narrow opinion, of course, it only stands for one thing, which is that Pennsylvania fire is still good law. But what Justice Gorsuch said, my language about jurisdictional strings attached, that's his language. He's the one that said that Norfolk Southern entered into this formality and agreed that they could do business in the form with jurisdictional strings attached. What we don't have in the PSJVTA is any similar antecedent authority. And this is the point that the Second Circuit made, which is it simply, the PSJVTA simply takes conduct that has regularly been declared to be constitutionally insufficient to support jurisdiction, waved a legislative magic wand and said, henceforth, if you engage in this jurisdictionally insignificant conduct, it's now jurisdictional insignificant. Well, doesn't that run squarely in the face of what Justice Gorsuch unequivocally said in Mallory, and that is that there are three bases for jurisdiction. There's general jurisdiction, there's specific jurisdiction, and then there's implied consent. Implied consent, by definition, doesn't necessarily have to satisfy the predicates for general or specific jurisdiction. Absolutely. And that's not my argument, and I want to be clear about my argument. My argument is that what Bauxite requires, right, so we know Bauxite is good law, because Bauxite was not a narrow plurality opinion. But what Mallory said is our guidepost here is when we have a legislative presumption of consent, same thing we have here, that the test is the conduct material to jurisdiction. You can find that at page 705 of the decision in Bauxite. And my point, and this is my only point, Judge Bacharach, I'm not saying that the Court is handcuffed by a specific jurisdiction decision. What I'm saying is if you're using a barometer, as Bauxite requires, to say is this conduct material to the issue of jurisdiction, and before that barometer is applied, the courts have said this conduct is not material to jurisdiction, then that helps answer what is otherwise, candidly, a fairly squishy question under Bauxite. It's a bit circular, right? Bauxite said the conduct has to support a presumption of submission. Well, what does that mean? And what it then explains is it means that the conduct has to be material to jurisdiction. Well, what does that mean? Bauxite, I think, tells us, right? Bauxite involved a refusal to produce jurisdictional discovery. What the Court said is, well, that's plainly material to the issue of jurisdiction, right, because they're supposed to produce facts in discovery that say whether they've operated in the jurisdiction or not, but because the conduct is material to jurisdiction, we can engage in a presumption that that's what the evidence would have shown. When you have courts, the D.C. Circuit, in three or four cases, and I'd like to give a question to Mr. Perlow, who clearly evoked the whole thing of the Clement case, so I don't need to tell Your Honor about the D.C. Circuit decisions, four of which applied to the same specific jurisdiction theory here, or Waldman-Socolo case in the Second Circuit. Every one of them has said that the PSJVTA predicate conduct is not material to the issue of jurisdiction, and we don't have to guess at what Congress did. Congress did two things to make it clear that what they were trying to do was take conduct declared jurisdictional immaterial by the D.C. Circuit and the Second Circuit and to say, tell you what, going forward, that same jurisdictional immaterial conduct now will be deemed to be consent. We are not the ones blurring the standards. And I think this is the point Judge Bianco made in his concurrence in the denial of rehearing en banc. He said, fundamentally, both the government and the plaintiffs blur the distinct requirements of imposed specific jurisdiction and consent to jurisdiction. And they do it in precisely the way that is the mirror image of Your Honor's question, which is they say, it is, we can simply say that we can, going forward, we can declare jurisdictional immaterial conduct to be jurisdictional material, but Bauxite says absolutely not. And that's the point. We have three buckets that Bauxite could fit into. And again, this was mentioned by the Second Circuit in full and in our brief, which is the recurring scenario of litigation conduct material to jurisdiction, that's Bauxite. We don't have that here. No litigation conduct that's involved. You have Mallory. Mallory is, again, Justice Gorsuch's words, an activity in the forum with jurisdictional strings attached. And the third is kind of the residual exception, the bucket that says, okay, if those two don't apply, does it look, walk, and talk like consent to jurisdiction? And that's my key point, which is, I'm not saying the Court's handcuffed by what was decided by the Second Circuit or the D.C. Circuit in a specific jurisdiction context, but I am saying that Bauxite requires the Court to find jurisdictional immaterial conduct. We could argue until the cows come home about what that is. It's conducting activity within the forum. Is that sufficient? Only. The answer in this case is no. Driving on the highway, we know is. I'm sorry, Your Honor? We know driving on the highway is. Absolutely. But I think you've helped me answer your own question. I'd like to do that, which is, the key point, and I listened attentively to the Mallory argument before the Supreme Court, and it's expressed in the opinion, although not in these words, which is, there has to be antecedent authority on the part of the forum to give you the benefit, to let you drive on the roads, to let you register to do business, to be a director of a Delaware corporation. The key point in full is that when it comes to the U.S. activity, which respectfully is not before this court, because the district court didn't reach it. The district court engaged in an as-applied analysis focused solely on the payments part. But entertaining Your Honor's question and trying to answer it, the United States government, long before the PSJVTA, surrendered antecedent authority to exclude the Palestinians from the United States when they engage in UN activity. It did so in the 1940s through the UN Headquarters Agreement. That's what the Southern District of New York decided in the U.S. versus PLO case. So what we have here is the United States saying, even though we have no authority to regulate this U.S. activity or to exclude you from attending the UN, any more than it could exclude, you know, Canada or Iran or North Korea or anybody who's unfavored by the United States. You know, we can't exclude you from the United States. Does the United States government have the authority to exclude the Palestinian Authority or the PLO from conducting activities unrelated to the establishment or maintenance of an office in the United States? It has surrendered that authority as to UN activities. And our argument— Where in—can you cite me any law that says that the Palestinian Authority or the PLO is prohibited from conducting any activity—activity—in the United States unrelated to the office that's allowed to conduct activity related to the United Nations? Well, I would cite three things. So first of all, I would cite the 1987 Anti-Terrorism Act. Then I would cite the Palestinian— That's for the establishment or maintenance of an office, isn't it? No, also activities. Activities, basically, it prohibits—it's not my interpretation, and the case to which I would refer, Your Honor, is the United States v. PLO, which is picked up in all of the previous decisions in the Second Circuit. It's a Southern District of New York case which correctly referred to the 1987 ATA as a wide-gauge restriction on PLO activity in the United States other than UN activity. You can find that at 695 F-SUP at 1471. But alongside that, because—although Your Honor helped me with this point in your question to Mr. Perlin—that's the PLO. But then they say, well, the PA is still conducting activity in the United States. Well, it's not. And don't take my word for it. When the United States signed the Oslo—when the United States supervised the Oslo Accords between Israel and the PLO, it recognized the PLO and only the PLO as the overseas representative of the Palestinian people. Judge Bianco made this point in his concurrence in the denial of re-hearing en banc in full, which is, we're only dealing with PLO activity. But it doesn't matter, because the Palestinian Anti-Terrorism Act of 2006, which we cite in our briefs, but which can be found at 120 Statute 3318, has—operates to the same effect as the 1987 ATA. But here's the tiebreaker, which is, government and counsel sit up, and surely we'll stand up again and rebuttal. The government says in its reply brief at pages 10 to 11 that it has—and I'm quoting here—long-imposed restrictions on defendants' operations and activities in the United States, close quote, which continue to—and again, quoting—generally prohibit the PA and PLO from engaging in a range of activities here, close quote. So the answer to your activities question is two statutes plus a government concession on that point, and because of that prohibition. And then, I see I'm almost running out of time, I want to touch briefly on Mr. Perlin's points, if the Court will give me the time, but the key point here is, because the United States long ago surrendered its ability to keep the Palestinians from attending the U.N., and because we contended that the district court never reached the question that all of the alleged activity here is U.N. activity, there is no analog to Hess or any other case where there's antecedent authority. Now, what's—your Honor would ask me, sure, well, give me, for instance, when it would apply, and the answer is history tells us. I apologize, I'm running over, but I'll let you finish the thought. Until 2018, when President Trump closed the PLO mission to the United States, there was in Washington, D.C., an embassy, a mission to the United States. That clearly, if it were reopened today, would be activity in the United States that's not U.N. related, that would trip the U.S. activities provision. And indeed, that was the kind of thing picked up in the previous statute, which did have the quid pro quo model, the ADCA. One last point on the PSJVTA, and then I'll race through Mr. Perlin's points. Judge Baldock asked the question about the pending petition for certiorari on the PSJVTA. And indeed, according to the Supreme Court clerk's office in the docket, that petition is scheduled to go to conference before the justices this Friday. If it's not relisted, we'll know Monday, if cert is granted. And then we had argued to the Supreme Court in opposition that this Court's views are consequential. And we'll know we have a circuit split or the like. The government has argued it, frankly, and I'm not trying to be snarky, this is a waste of time for anybody else to think about this issue, because the Supreme Court is going to deal with it. That's not our view, because unlike the Fuld case, which the government has argued is a facial challenge to the PSJVTA, we have here an as-applied challenge. Judge Gallagher expressly said he was considering constitutionality only as applied to the payments prompt. A quick couple of points on the other arguments. Judge Carson, you asked the question about Fifth Amendment versus Fourteenth Amendment. And I would say this Court already answered that question in P, P-E-A-Y, the Bell-South case, where it said at 203F3rd, pages 1211 to 1212, that the Fifth Amendment and the Fourteenth Amendment are, and I'm quoting here, virtually identical, close quote, in protecting the liberty interest. But even after that, in the Klein decision out of this Court, which said this is how we apply P, the factors that it recites are essentially the same and includes minimum context. So I don't think there's a serious argument that in this circuit there is a material difference between Fifth Amendment and Fourteenth Amendment jurisdictional process. Quickly on specific jurisdiction, look, everybody's entitled to file a lawsuit wherever they want. But the reason why we're here on specific jurisdiction is because of forum shopping. The theory alleged for specific jurisdiction in this case, which involves alleged U.S. advocacy, is a carbon copy of the theory considered and rejected on specific jurisdiction by the D.C. Circuit and the Second Circuit. At least two of the named plaintiffs in this case are New York residents. They could have filed this case in the Second Circuit. They brought it here because they don't want to be bound by the dispositive precedent. But Judge Bacharach, your question about was there publicity, I believe it was yours and I apologize to the other members of the panel if somebody else asked it, was there any publicizing of this particular attack as a result of, you know, in an effort to change U.S. policy? That's the point the D.C. Circuit picked up in Clement. Regardless of whatever you think about this ethereal notion that maybe U.S. advocacy is linked to violence, if there's no effort to try to tie this specific attack, then that's not enough. They argue on pages 37 and 38 of their opening brief at 18 and 19 of the reply brief that that is exactly why Ford doesn't apply is because otherwise there would have had to have been evidence that Ford had targeted the advertising and promotional activities within that state, and the Supreme Court had not done that in Ford, and so there doesn't have to necessarily be for the related to cause a linkage between the activity and this particular tortious injury. There has to be more.  There has to be. My response is that we know what this circuit thinks about Ford because the Hood decision of this Court, to which Mr. Perlin adverted, explains how this circuit has been applying for it. And what it, number one, makes clear is there has to be tortious activity in the forum, which Ford, by the way, required. But here's what Hood says. Hood said that the relates to prompt of Ford requires the plaintiff to show that he was, quoting, injured by activity essentially identical to activity that the defendant directs at other forum residents. That's at 21 F. 4th, 1224. And further, this Court said in Hood that Ford is not satisfied unless the defendant's activity, quote, regularly include activity substantially the same as that giving rise to the claim against it, 21 F. 4th of 1225. How do I apply that? That means that there has to be tortious activity. And all they say is that, well, even it wasn't directed at them, that the PA and PLO engaged in U.S. advocacy in the United States and that somehow that's like what they've done. The problem is it's not tortious, and that's the fulcrum. Ford requires tortious activity. Hood requires tortious activity. The same U.S. advocacy has been held not to be tortious, as the Second Circuit pointed out in Waldman 1, 835 F. 3rd at 342. U.S. advocacy is not connected to the wrongs that harm the plaintiffs because it's not tortious. Mr. Perlin has said- We're going to have to, yeah, I'll let you finish up. That said, you know, it violates the ATA, it doesn't. They read the material element out of the ATA, which is intimidation and coercion. Second Circuit said advocacy in the United States in the past by the Palestinians is advocacy. It doesn't involve intimidation or coercion. Thank you for letting me run over. We respectfully ask that the Court affirm the decision of the District Court. Thank you. Paul, since we let him go over, let's give three and a half minutes to each of the appellants for their rebuttal. In addition to that, I think we have a little bit of time, yeah. First I'm going to start with Mr. Berger's last point. Ford Motor does not require informed tortious activity. The activity of Ford Motor in the forum was advertising and selling cars. It wasn't tortious activity. Ford Motor does say that you don't require causation, a causal link between the informed activity and the claim, and you don't need to show a link between the informed activity and the injury to the plaintiff. What it does say is that the informed activity has to be relevant to the claim. And that standard is flexible depending on the context. Second of all, I would say that if due process rights are extended to government and foreign political entities like the PA and the PLO, who is next? ISIS, Al-Qaeda, the Houthis, are they also entitled to due process rights? These are not the types of entities of international actors who are intended to be covered by the due process clause. In terms of forum shopping, we filed the suit in the District of Colorado because one of the plaintiffs lives in Boulder. Most of the plaintiffs live abroad. Most of them are American citizens. But there's a plaintiff here that lives in Boulder, and that's why we filed here. Finally, Mr. Berger spoke about knowing involuntary activity triggering the PSJVTA. There's no requirement that a defendant wants to be subject to jurisdiction. There's a requirement that the defendant act with the knowledge of the consequences of their activity, they are expressing their consent to jurisdiction. And that's what the PA and the PLO have done, whether it's through the pay-to-slay policy where they had notice that paying terrorist murderers of American citizens will subject them to jurisdiction in American courts. They knew about that. They knew that the date passed, the trigger date passed, and they continued to engage in those activities. That's enough. Well, the pay-for-slay, was that the PLO or the PA? It was both. Because one of the difficulties that I had was both in the complaint as well as in the briefing, it seemed to me that you all paint with somewhat of a broad brush about the PA and the PLO, and they are obviously distinct entities. They are distinct entities, and I think we tried at least to distinguish the two. I think the defendants tried to conflate the two where it's convenient. We tried to say that the PA is a foreign government, and the PLO is a foreign political entity that purports to be the exclusive representative of the Palestinian people. The PA, I think you said was international. I think you meant domestic, right? I'm sorry? The PA is a domestic. I meant international from the point of view of the American courts. Okay. It is a foreign government, right? But the PA and the PLO engaged in U.S. activities. The PA was not invited to the United Nations, so they can't rely on the United Nations defense, UN activities defense, for their U.S. activities. They're nonexistent. The amended complaint alleges facts that demonstrate that both defendants engaged in U.S. activities, and Mr. Berger's denials in court do not refute those facts. Thank you. Thank you, Your Honors. Good morning. Defendants say that the activities prong of the PSJA VTA is not at issue here. I don't understand the district court to have made findings one way or the other as to whether that prong was satisfied, and the United States is not taking a position on whether that prong is satisfied here. But the district court did conclude that the statute was unconstitutional wholesale, so I do believe that that question is before the court. But they did point out that you acknowledged in your brief that any activity by the PA in the United States is illegal. Well, Your Honor, the United States has the authority to prohibit a range of conduct by those entities in the United States. In many cases, it has done so. Those are subject to executive and statutory waivers. But that only underscores that the activities prong is constitutional, comports with the elementary process. Well, I understand that. I had thought that the PA and the PLO were prohibited from maintaining or establishing an office in the United States, but that they could otherwise conduct activities. But I think I was wrong about that. So the statute, there's a statute addressing the PA maintaining facilities in the United States. The prohibitions on the PLO are broader. But in any event, you know, I don't think defendants should be taking the fundamental, you know, to be contesting the fundamental point that the United States does have, you know, broad authority in this area to define the extent to which the PA and PLO can operate in the United States. And within their own theory, Your Honor, that comports with Fifth Amendment due process. I mean, they say that if you have the antecedent authority to exclude, you can condition, you know, conducting activities in the forum. So, again, under their own theory, the activities prong satisfies due process. I think, of course, we think they're wrong that that kind of reciprocal exchange of benefits is required. Judge Bacharach, you noted the statutes at issue in Mallory. You're correct that those statutes weren't phrased in the sense of there's some kind of explicit exchange. They, you know, set out conduct and then separate statutes provided that registering in the state, the state court could exercise jurisdiction over them on any claim. So, you know, in that case, by virtue of the registration in the forum, Pennsylvania could exercise jurisdiction over a claim from a Virginia resident over a cause of action that arose out of state. And the court held that that complied with Fifth Amendment due process. And many other arguments of the defendants run headfirst into Mallory. They claim, you know, this is jurisdiction imposed by a statute. The dissent raised similar arguments in Mallory that did not carry the day with the majority. Similarly, the defendant in Mallory argued he had not really consented to suit in the forum. But Justice Gorsuch, in his opinion, the other concurring opinions, emphasized that the statute was clear and the defendant had taken actions knowingly and voluntarily that were under the statute considered consent to jurisdiction. If there are no further questions, we rest on the arguments in our brief. All right, thank you. Thank you very much. This matter was very well presented both in your briefs and in oral argument today. I thought your advocacy for both sides was really quite extraordinary and helpful. Court is adjourned until 9 o'clock tomorrow. Thank you.